Claudia Sandoval and Nick Castaneda
2104 E Compton Ave., Apt. 15
Compton, CA 90221
Clausando91@gmail.com
(562) 209 9240



FILED
CLERK, U.S. DISTRICT COURT

10/29/23

CENTRAL DISTRICT OF CALIFORNIA
BY: ___EEE___ DEPUTY

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

NICK CASTANEDA, an individual;
CLAUDIA SANDOVAL, an individual;

Plaintiffs.

v.

COUNTY OF SAN BERNARDINO;
CHILDREN AND FAMILY SERVICES;
SHANNAE HART, an individual;
AUTUMN WALKER, an individual; /
JANICA OWNBEY, an individual;
WESLEY WILLIAMS, an individual;
CHRISTINE SIPIN, an individual;
STEPHANIE RIOS, an individual; ELLA
MONGER, an individual; CINDY LOPEZ,
an individual; PIERRE DOUNG, an
individual; NICHOLE ROACH, an
individual; LAURA LEE, an individual;
MARICRUZ DOMINGUEZ, M.S, an
individual;  LOMA LINDA UNIVERSITY
MEDICAL CENTER; a corporation;
LOMA LINDA UNIVERSITY HEALTH
CARE, a corporation; LOMA LINDA
UNIVERSITY CHILDREN'S HOSPITAL,
a corporation; LOMA LINDA
UNIVERSITY a corporation; KOMAL
AZIZ, M.A.; an individual, LAURA ANN

**COMPLAINT FOR DAMAGES**

5:23-CV-02246-UA

Claim 1: 42 U.S.C. §1983
(JudicialDeception,Unnecessary/
Excessive Duration of Continued
Detention)

Claim 2: Monell-Related Claims
(Judicial Deception)

**(DEMAND FOR JURY TRIAL)**

COMPLAINT FOR DAMAGES
SANDOVAL, ET. AL. v. COUNTY OF SAN BERNARDINO, ET. AL.

1

JACOBSON, M.D; an individual,; KIM PERRY GRANT, an individual; YEN-YING WU, M.D., an individual; SAN BERNARDINO COUNTY SHERIFF'S DEPARTMENT; DETECTIVE RACHEL YOUNG, an individual; DEPUTY MALDONADO; DETECTIVE VANAYES QUEZADA, G3235, an individual; J. BURKHART,  A8313, an individual; DOES 1 through 20, inclusive,
        Defendants

## **INTRODUCCION**

1.     CLAUDIA and NICK have lived happily together with their children since 2018. CLAUDIA is the natural mother of A.A., E.C, A.C and E.D.C.  Nick is the natural father of E.C, A.C, and E.D.C.  Claudia and Nick are married and have been married for almost five years. CLAUDIA, NICK, A.A. and E.C. resided in a loving, child-centered home in Los Angeles County, where they flourished. CLAUDIA, NICK, A.A and E.C. moved to San Bernardino County in January 2021 due to getting a bigger space for their children and CLAUDIA'S parents moving with them.

2.     A.A. was born on 1/07/16. His father is Jonathan Aparicio. Claudia marry Mr. Aparicio, however the marriage did not last.  CLAUDIA divorce Jonathan Aparicio on 07/10/2017. CLAUDIA maintained full custody of A.A. NICK treated A.A. like his own son. He was a loving father figure to him. A.A. spent every day from 2017 with NICK until he was removed by CFS on October 17, 2021. NICK participated in his daily

COMPLAINT FOR DAMAGES
SANDOVAL, ET. AL. v. COUNTY OF SAN BERNARDINO, ET. AL.

2

activities and included him in daily outings and trips. They would play together, pray together, dine together, cuddle together, and for all intents and purposes, he treated him like his own son and A.A. like his father.

3.      NICK has one other child he successfully helped raise who lives in El Salvador. He has steady employment and a stable residence with CLAUDIA.  NICK and CLAUDIA have no arrest record. CLAUDIA AND NICK always provided a source of stability, love and comfort for all of their children.

4.      CLAUDIA and NICK met in 2017 and were married on 12/28/2018. They lived together with A.A. as a family. NICK and CLAUDIA had their first baby girl on 06/17/2020, E.C. when E.C. was one month old, CLAUDIA noticed that her daughter head was misshapen.  There was a soft indentation on the top of her head. CLAUDIA immediately took E.C. to her pediatrician, TERESITA SALAZAR, M.D. as CLAUDIA, knew that the family had a history bone disease. TERESITA SALAZAR, referred E.C. to neurology specialist and to receive an MRI. Pediatrician SALAZAR apparently did the right thing by sending E.C. to experts. Even though, SALAZAR could not find an explanation, both her and the neurologist, JAVAHERY RAMIN JOSEPH, ruled out non-accidental trauma (NAT). The doctors determined that there was no need for any surgery and treatment as the deformation would heal itself.

5.      In the medical reports the neurosurgeon established that he believed that "The deformities and fractures in E.C.'s skull were caused by issues related to birth." Yes, most

COMPLAINT FOR DAMAGES
SANDOVAL, ET. AL. v. COUNTY OF SAN BERNARDINO, ET. AL.

3

likely the fractures and deformations in E.C.'s skull was created by passing through the Birth Canal, but what caused E.C.'s bones to be fragile at birth, to the point of being fractured and deformed in the Birth Canal?

6.      One year later they were blessed with another beautiful daughter A.C. she was born on 09/25/2021. As with E.C. Her mother CLAUDIA, knowing the history of irregular bones in the family, and what occurred with E.C. one year ago, CLAUDIA was vigilant in examining her new baby, A.C.'s body to find abnormalities. With A.C. it was different, although within the first days of birth CLAUDIA found some anomalies in A.C.'s skull, she noticed a new and different symptom.  A.C. had a small, what looked like a broken capillary, in her eye. CLAUDIA and NICK took little A.C. to the pediatrician on October 14, 2021. The pediatrician who treated the girl was MARCUS BARBER, M.D., in Victorville.  He checked A.C's. body, and found no signs of physical damage. He found A.C. to be within the normal limits for her age and without any apparent health problems, other than the small spot in her eye. Dr. BARBER stated that babies can rupture the capillaries in their eyes involuntarily and/or when they cough or cry, which he stated was nothing urgent.  Dr. BARBER then stated that they should get further work-up at the hospital because they have more facilities, but that it was not urgent and that they could take her after Nick finished work. (as they only had one working car between the two of them). Dr. Barber's referral was to A.C. either at CHOC Hospital in Orange County or at Loma Linda University Hospital in San Bernardino County.

COMPLAINT FOR DAMAGES
SANDOVAL, ET. AL. v. COUNTY OF SAN BERNARDINO, ET. AL.

4

7.      On October 15, 2021 they took A.C. to the hospital. Even NICK, after being awake for 2 days straight and being exhausted from his hard work and many hours driving, took A.C. to the LLUCH as soon as he returned. It is important to point out that from the first moment both CLAUDIA and NICK were treated as criminals.  It was contempt prior to investigation.  They would try to ask questions about their baby girl and the doctors and staff would completely ignore them and would leave the room leaving the very concerned NICK and Claudia with no answers or explanations.  In fact, not even one of the LLUCH doctors or staff members even acknowledged them with a concerned or caring gesture. This is where the whole family's nightmare began.

*The nightmare…*

8.      A parade of doctors, residents, fellows, nurses, social workers, to name a few, peppered the parents with questions about what had happened to A.C. However, they refused to answer any of their own questions.  Regardless of what the parents said, they concluded, as if they had not even listened to anything they said, concluded, that same day, that A.C.'s injuries were because of N.A.T.

9.      Mother and Father kept repeating to the doctors and staff that, "A.C. comes from a family with genetic and/or congenital problems with bone formation causing significant weakness in their bones and in their bone formation. Even her older sister, E.C, presented very similar symptoms one-year prior.

COMPLAINT FOR DAMAGES
SANDOVAL, ET. AL. v. COUNTY OF SAN BERNARDINO, ET. AL.

5

10.     The results of A.C.'s skull imaging studies upon admission revealed that she had fractures and deformities just like her older sister E.C. And, given the ignorance of what was happening in the girl's body, the only "reasonable" hypothesis was that "these Latin parents brutally beat the girl and fractured her skull." The hypothesis of brutal blows prevailed in LLUCH, but how is it possible that a newborn received brutal blows, similar to a crash in a car at 100 miles per hour, and that A.C. was ejected outward, breaking the windshield with the head, and crashing on the pavement with the skull, and that A.C. was still alive? And even more intriguing, how is it possible to have received brutal blows like those they thought without having even a scratch, bump, bruise or abnormality on the scalp? The hypotheses of child abuse and brutal beatings were physically and medically unsustainable and impossible, common sense vanished at Loma Linda.

11.     A.C. and her family were victims of an overzealous, "child abuse specialist" fellow, Dr AZIZ.  As a fellow, AZIZ was only approximately 2 months into her 3-year training, yet she would be so wed to her preconceived conclusion that she would even change or get others to change their opinions regarding the injuries if their opinions did not line up with hers.  In the face of inexperience and ignorance, bad faith and the formulation of unreal conclusions, Dr. KOMAL AZIZ, who had only been a licensed pediatrician for one year and had no more than 15 weeks into her 3-year training for a child abuse specialization.  To add insult to injury, AZIZ's fellowship supervisor Laura Jacobson, M.D., was still in training for her child abuse specialization. This is where error and ignorance end, and evil, hatred and discrimination begin. And, it must be said,

COMPLAINT FOR DAMAGES
SANDOVAL, ET. AL. v. COUNTY OF SAN BERNARDINO, ET. AL.

6

the system of fraud and child monetization that exists in San Bernardino County came into play.

12.     The parents were taken to the San Bernardino sheriff's station near the hospital for questioning. CLAUDIA and NICK's response to these interrogations was the absolute truth, the same one that many doctors and students had heard: "Nothing illegal or violent has happened with A.C. Her older sister E.C. has similar symptoms." It should be noted that by that time NICK had already gone without proper sleep for more than 3 days. Furthermore, both CLAUDIA and NICK were focused on A.C.'s health status and not on legal matters or police investigations. DETECTIVE QUEZADA took advantage of CLAUDIA and NICK's honesty and made them victims of his ministerial tactics made for criminals, not for people who act in good faith and are accustomed to respecting authority and being transparent.

13.     AZIZ, did not have the experience to accurately assess the cause of A.C.'s injuries. Nor did she have the years of experience as did Dr. Salazar, the pediatrician who treated and assessed E.C.'s injuries one year earlier.  The hypothesis that AZIZ communicated to QUEZADA about brutal beatings was simply ridiculous. The amount of force needed to break a bone is similar to that of crushing an aluminum can or breaking a pencil.  More importantly, as the orthopedic surgeon, with 40 + years experience stated that it would take significantly less force if bone disease or some metabolic bone disorder was present. Inexperienced AZIZ testified with absolute certainty that the mechanism of injury is The hypothesis of brutal blows prevailed in LLUCH, but how is it possible that a newborn

COMPLAINT FOR DAMAGES
SANDOVAL, ET. AL. v. COUNTY OF SAN BERNARDINO, ET. AL.

7

received brutal blows, like injuries received in a "serious car crash, with a car driving at 100 miles per hour, where A.C. would have been ejected outward, breaking the windshield with the head, and crashing onto the pavement with the skull.

14.     Both police officer QUEZADA and social worker SHANNAE HART bought Azi's extremely flawed theory hook, line and sinker.  And from that point on treated the case as if the injuries, and even the past injuries to EC,  were definitively as a result of NAT.

15.     AZIZ's diagnosis was not compatible with the results of the initial testing and bone scans.  The inexperience of Detective QUEZADA, Detective YOUNG and Hart was evident when they did not review the medical records, results of tests or spoke to any other of the numerous doctors treating AC and EC. Instead, they did what was easiest for them, took AZIZ's unfounded conclusion and ran with it as the unquestionable truth.

16.     LLU, LLUCH, LLUHC,  put students and inexperienced people in positions to make conclusions that greatly affect their patients' lives and the lives of their families. And San Bernardino County hires, but fails to adequately train police officers and social workers to fully investigate and objectively analyze what they observe. Did QUEZADA and Hart know the protocols to determine N.A.T or when a fracture is the result of blows vs when it is caused by a congenital and/or genetic defect? These public servants, who deal with one of the most important issues in society, protecting children, not know such basic issues?

COMPLAINT FOR DAMAGES
SANDOVAL, ET. AL. v. COUNTY OF SAN BERNARDINO, ET. AL.

8

17.     As a result of so much ineptitude, hate and negligence by LLUCH and COUNTY, CLAUDIA and NICK lost custody of all four of their children, right there at the hospital, on October 17, 2021.

18.     HART arrived at 2:50 am with ssa Christian and deputy Maldonado while NICK was being questioned at the station. Hart told CLAUDIA, that they were there to take the kids and that she needs to leave the hospital immediately because NICK has confessed. This couldn't be further from the truth and review of the police interview confirmed that this statement was completely fabricated.

19.     NICK agreed to a lie detector test but asked the detective if he could take it tomorrow, so he can go back to the hospital to check on his daughter.  QUEZADA then arrested NICK.  NICK was unable to return to the hospital and be with his daughter and instead was taken to a detention center where they accused him of brutally beating A.C. and endangering the life of his daughter. He was released the following day and on January 13, 2022 he was informed that the prosecutor is not failing any case against him as there was no evidence supporting that conclusion. Both CLAUDIA and NICK were inhumanly punished by being separated from their children. NICK, arrested and being the victim of a police officer who, without evidence of the accusations, separated him from his family, arresting him and sending him to a detention center. For both of them, this has represented the greatest pain they have experienced in their lives, perpetrated by authorities who are inexperienced and do not have the slightest empathy for anyone,

COMPLAINT FOR DAMAGES
SANDOVAL, ET. AL. v. COUNTY OF SAN BERNARDINO, ET. AL.

9

whether accused of a crime or not, as they treated NICK as though he brutally beat his own baby daughter.

20.     The abuses and violations of Civil and Human Rights that have been committed against the children A.A. (7), E.C. (3), A.C (2) AND E.D.C. (1) are unacceptable and represent the most atrocious side of human being. These violations have been with the objective of monetizing minors. That is, to obtain money from taxpayers, obtaining capital to finance the operations of lawyers, doctors, social workers, County supervisors and others involved. These actions are a burden on society because those who committed them are people and public servants whose social function is exactly the opposite of what they did. They have therefore created a system of corruption and organized crime, which aims to obtain money through fraud that, is perpetrated against low-income families and against children who are innocent and cannot defend themselves.For this egregious financing method, San Bernardino County authorities have trampled the rights of CLAUDIA SANDOVAL and NICK CASTANEDA. An entire family has been brutally dismantled and damaged, for no justifiable legal reason.

21.     In fact, even today, the children, especially EC and AC health is in danger as the underlying condition has not been diagnosed, or treated and AC has been rehospitalized after her removal for various life-threatening issues.   It is evident that being right over the truth is by far the more important to CFS and the inexperienced, overzealous doctors that treated AC back in October 2021. The children's undiagnosed and untreated medical

COMPLAINT FOR DAMAGES
SANDOVAL, ET. AL. v. COUNTY OF SAN BERNARDINO, ET. AL.

10

conditions continue to be ignored.  CFS even failed to take the children to their follow-up appointments with endocrinology and hematology. They need to be assessed and treated by doctors who specialize in the rare diseases. The longer they go without being cared for, the greater the damage will be, and it has the potential to leave consequences for the entire life of minors, including losing their lives.

22.    We are facing a case that completely exposes the illicit operations of a group of individuals who work in a coordinated manner, knowing that they are violating the Law and the rights of honorable people.

23.    Their acts and omissions are criminal, such as Operation with Resources of Illicit Origin, Racketering, Fraud, Endangering Life of Children, and others.

24.    To clearly explain and demonstrate what is mentioned in the previous paragraphs, it is necessary to make an exhaustive narration and explain the context of the Facts.

25.    Although AA did not suffer any injuries whatsoever, he was abruptly taken from his parents' side and placed in foster care, where he remains to this day. The only saving grace is that he is placed with his sisters.

26.    CLAUDIA became pregnant during the life of the case and what is typically a joyous occasion became that of a parent's worst nightmare. As soon as CFS got wind of EDC's birth, 08/25/2022, they ripped Claudia and NICK's newest addition to their family

COMPLAINT FOR DAMAGES
SANDOVAL, ET. AL. v. COUNTY OF SAN BERNARDINO, ET. AL.

11

right from their arms.  Claudia has not seen any of her babies since September 2022.

Nick has not seen his babies since ) October 17, 2021.


## JURISDICTION AND VENUE

1.      Plaintiffs, NICK CASTANEDA and CLAUDIA SANDOVAL bring this action

pursuant to 42 U.S.C. §1983, *et. seq*., to redress the deprivation of rights secured under

the United States Constitution, including the Fourth and Fourteenth Amendments. These

violations were inflicted by each of the Defendants in the manner herein alleged.

2.      Jurisdiction is conferred on this Court by 28 U.S.C. §§1343(a)(3) and 1343(a)(4),

which provide for original jurisdiction in this Court of all suits brought pursuant to

section 1983. Jurisdiction is also conferred by 28 U.S.C. §1331.

3.      Because the acts and omissions complained of occurred in the County of San

Bernardino, and it is believed that all Defendants currently reside in the County of Los

Angeles, venue is proper in the Central District of California.

4.      These allegations are based on Plaintiffs' personal knowledge, or on information

and belief.


## PARTIES

5.      Plaintiffs, Nick Castaneda and Claudia Sandoval are and were at all material times

mentioned herein, residents of the County of San Bernardino, State of California.

COMPLAINT FOR DAMAGES
SANDOVAL, ET. AL. v. COUNTY OF SAN BERNARDINO, ET. AL.

12

6.     Plaintiff, CLAUDIA, is the natural and biological mother of her minor children, A.A. (born 1/7/16), E.C. (born 6/17/20), A.C. (born 9/25/21), E.D.C. (born 08/25/22). Plaintiff, NICK, is the natural and biological father of the child E.C., A.C., E.D.C.

7.     Pursuant to F.R. Civ.P. 5.2, the minor children's names are reduced to initials in these pleadings. In order to protect the children's privacy, it is Plaintiffs' intent to use this designation unless and until such time the Court orders otherwise.

8.     At all times relevant herein, prior to the removal of A.A E.C, A.C, E.D.C., from Plaintiffs' care by Defendants, Plaintiff, CLAUDIA, raised, nurtured, provided guidance, and cared for her children.

9.     At all times prior to the wrongful removal and continued detention of the children by Defendants, Plaintiffs enjoyed the company, companionship, and society of their children, and all other benefits and burdens of their rights of familial association with their children.

10.     At all times mentioned herein, the COUNTY OF SAN BERNARDINO ("COUNTY") was and is a public entity. It is a municipality in corporate form, organized and existing under the laws of the State of California.

11.     At all times applicable herein, the County of San Bernardino Department of Children and Family Services ("CFS") was and is a subdivision, entity, or administrative arm of the County of San Bernardino, which together with COUNTY, promulgated, encouraged, and/or permitted, the policies, patterns, and practices under which the individual Defendants, SHANNAE, AUTUMN, STEPHANIE, JANICA,

COMPLAINT FOR DAMAGES
SANDOVAL, ET. AL. v. COUNTY OF SAN BERNARDINO, ET. AL.

13

WESLEY,CHRISTINE, ELLA, CINDY, PIERRE, NICHOLE,  MAYRA G, JANE, MARICRUZ and Does 1-20 committed the acts or omissions complained of herein, and of which policies, practices, customs, and/or procedures, and/or failure to train, whether or not promulgated in written form, encouraged, or allowed to persist by Defendant COUNTY. COUNTY condoned, ratified, and ignored without remediation the conduct of the social worker Defendants pursuant to said policies, practices, customs, and procedures, as complained of herein.

12.    As the employer of social workers and their supervisors, COUNTY and/or CFS had primary responsibility for the training, education, and supervision of social workers, emergency response workers, dependency intake workers, placement workers, and all other CFS personnel, and CFS supervisors.

13.    Plaintiffs contend that the policies, practices and procedures of CFS aforesaid and herein below, inclusive of the material misrepresentation of facts along with the failure to include mitigating and/or exculpatory evidence in reports presented to the court as well as throughout the protective custody warrant, constitute a basis for governmental liability in this case pursuant to the *Monell* theory of liability. Plaintiffs have not and do not plead as a separate "Claim for Relief," as the *Monell* liability for the COUNTY liability of the COUNTY is based on a legal and case law based theory of liability, which applies to each of the CAUSES OF ACTION against the individual Defendant-employees. However, in the event the Court may desire a separate Claim for Relief for such liability,

COMPLAINT FOR DAMAGES
SANDOVAL, ET. AL. v. COUNTY OF SAN BERNARDINO, ET. AL.

14

Plaintiffs reserve the right to seek leave to separately set forth a Claim for Relief for *Monell* liability.

14.     Such *Monell* liability also exists based on the fact COUNTY has failed to train at all and/or failed to train employees adequately on state and federal laws, statutes, and/or regulations implicated in the context of a child abuse/neglect investigation. For these policies, procedures, practices/customs, and inadequate or non-existent training, Plaintiffs do hereby seek to hold COUNTY responsible in whole or in part for the conduct of the individual Defendants herein named.

15.     Plaintiffs hereby sue all agencies and departmental units of COUNTY specified hereinabove under the designation of COUNTY herein, and/or interchangeably

16.     At all times relevant herein, Defendant social worker SHANNAE HART ("HART") was an individual residing, on information and belief, in the County of San Bernardino, and an officer, agent, and employee of COUNTY and CFS, acting under color of law and within the course and scope of her employment, driven by COUNTY'S official policies and practices.

17.     At all times applicable herein, Defendant supervising social worker AUTUMN WALKER ("WALKER") was an individual residing, on information and belief, in the County of San Bernardino, and an officer, agent, and employee of County of San Bernardino and CFS, acting under color of law and within the course and scope of his employment, and individually, driven by COUNTY'S official policies and practices.

COMPLAINT FOR DAMAGES
SANDOVAL, ET. AL. v. COUNTY OF SAN BERNARDINO, ET. AL.

15

18.     At all times relevant herein, Defendant social worker JANICA OWNBEY ("OWNBEY") was an individual residing, on information and belief, in the County of San Bernardino, and an officer, agent, and employee of COUNTY and CFS, acting under color of law and within the course and scope of her employment, driven by COUNTY'S official policies and practices.

19.     At all times applicable herein, Defendant supervising social worker WESLEY WILLIAMS ("WILLIAMS") was an individual residing, on information and belief, in the County of San Bernardino, and an officer, agent, and employee of County of San Bernardino and CFS, acting under color of law and within the course and scope of his employment, and individually, driven by COUNTY'S official policies and practices.

20.     At all times relevant herein, Defendant social worker CHRISTINE SIPIN ("SIPIN") was an individual residing, on information and belief, in the County of San Bernardino, and an officer, agent, and employee of COUNTY and CFS, acting under color of law and within the course and scope of her employment, driven by COUNTY'S official policies and practices.

21.             At all times applicable herein, Defendant supervising social worker STEPHANIE RIOS ("RIOS") was an individual residing, on information and belief, in the County of San Bernardino, and an officer, agent, and employee of County of San Bernardino and CFS, acting under color of law and within the course and scope of his employment, and individually, driven by COUNTY'S official policies and practices.

COMPLAINT FOR DAMAGES
SANDOVAL, ET. AL. v. COUNTY OF SAN BERNARDINO, ET. AL.

16

22.    At all times relevant herein, Defendant social worker ELLA MONGER ("MONGER") was an individual residing, on information and belief, in the County of San Bernardino, and an officer, agent, and employee of COUNTY and CFS, acting under color of law and within the course and scope of her employment, driven by COUNTY'S official policies and practices.

23.    At all times applicable herein, Defendant social worker CINDY LOPEZ ("LOPEZ") was an individual residing, on information and belief, in the County of San Bernardino, and an officer, agent, and employee of County of San Bernardino and CFS, acting under color of law and within the course and scope of his employment, and individually, driven by COUNTY'S official policies and practices.

24.    At all times relevant herein, Defendant supervisor social worker PIERRE DOUNG ("DOUNG") was an individual residing, on information and belief, in the County of San Bernardino, and an officer, agent, and employee of COUNTY and CFS, acting under color of law and within the course and scope of her employment, driven by COUNTY'S official policies and practices.

25.    At all times applicable herein, Defendant social worker NICOLE ROACH ("ROACH") was an individual residing, on information and belief, in the County of San Bernardino, and an officer, agent, and employee of County of San Bernardino and CFS, acting under color of law and within the course and scope of his employment, and individually, driven by COUNTY'S official policies and practices.

COMPLAINT FOR DAMAGES
SANDOVAL, ET. AL. v. COUNTY OF SAN BERNARDINO, ET. AL.

17

26.     At all times relevant herein, Defendant deputy director LAURA LEE ("LEE")was an individual residing, on information and belief, in the County of San Bernardino, and an officer, agent, and employee of COUNTY and CFS, acting under color of law and within the course and scope of her employment, driven by COUNTY'S official policies and practices.

27.     At all times relevant herein, Defendant CHILDREN ASSESSMENT CENTER interviewer MARGARITA DOMINGUEZ, M.S. ("DOMINGUEZ") was an individual residing, on information and belief, in the County of San Bernardino, acting under color of law and within the course and scope of her employment with COUNTY OF SAN BERNARDINO and individually, driven by COUNTY'S official policies and practices.

28.     At all times applicable herein, Defendant LOMA LINDA UNIVERSITY CHILDREN'S HOSPITAL. ("LLUCH") was a corporation organized and existing under the laws of the State of California and was and was qualified to do business in California.

29.     At all times applicable herein, Defendant LOMA LINDA UNIVERSITY HEALTH CARE ("LLUHC") was a corporation organized and existing under the laws of the State of California and is and was qualified to do business in California.

30.     At all times applicable herein, Defendant LOMA LINDA UNIVERSITY MEDICAL CENTER ("LLUMC") was a corporation organized and existing under the laws of the State of California and is and was qualified to do business in California.

COMPLAINT FOR DAMAGES
SANDOVAL, ET. AL. v. COUNTY OF SAN BERNARDINO, ET. AL.

18

31.     At all times applicable herein, Defendant LOMA LINDA UNIVERSITY UNIVERSITY ("LLU") was a corporation organized and existing under the laws of the State of California and is and was qualified to do business in California.

32.     At all times applicable herein, Defendant SHANNAE HART, was an individual residing, on information and belief, in San Bernardino County.

33.     At all times applicable herein, Defendant AUTUMN WALKER, was an individual residing, on information and belief, in San Bernardino County

34.     At all times applicable herein, Defendant JANICA OWNBEY was an individual residing, on information and belief, in San Bernardino County.

35.     At all times applicable herein, Defendant WESLEY WILLIAMS was an individual residing, on information and belief, in San Bernardino County.

36.     At all times applicable herein, Defendant CHRISTINE SIPIN was an individual residing, on information and belief, in San Bernardino County.

37.     At all times applicable herein, Defendant STEPHANIE RIOS, was an individual residing, on information and belief, in San Bernardino County.

38.     At all times applicable herein, Defendant ELLA MONGER was an individual residing, on information and belief, in San Bernardino County.

39.     At all times applicable herein, Defendant CINDY LOPEZ was an individual residing, on information and belief, in San Bernardino County.

40.     At all times applicable herein, Defendant PIERRE DOUNG was an individual residing, on information and belief, in San Bernardino County.

41.    At all times applicable herein, Defendant NICHOLE ROACH was an individual residing, on information and belief, in San Bernardino County.

42.    At all times applicable herein, Defendant LAURA LEE was an individual residing, on information and belief, in San Bernardino County.

43.    At all times applicable herein, Defendant MARICRUZ DOMINGUEZ, M.S was an individual residing, on information and belief, in San Bernardino County.

44.    At all times applicable herein, Defendant KOMAL AZIZ, M.D was an individual residing, on information and belief, in San Bernardino County.

45.    At all times applicable herein, Defendant LAURA ANN JACOBSON, M.D was an individual residing, on information and belief, in San Bernardino County.

46.    At all times applicable herein, Defendant FARAZ ALI KHAN, M.D. was an individual residing, on information and belief, in San Bernardino County

47.    At all times applicable herein, Defendant PERRY GRANT was an individual residing, on information and belief, in San Bernardino County.

48.    At all times applicable herein, Defendant YEN-YING WU, M.D. was an individual residing, on information and belief, in San Bernardino County.

49.    Defendant COUNTY is a municipality organized and operating under the laws of California.

50.    The SAN BERNARDINO COUNTY SHERRIF DEPARTMENT ("SHERIFF") is a governmental agency organized and existing pursuant to the law and policies of Defendant COUNTY, which together with SHERIFF, promulgated, encouraged, and/or

20

COMPLAINT FOR DAMAGES
SANDOVAL, ET. AL. v. COUNTY OF SAN BERNARDINO, ET. AL.

permitted, the policies, patterns, and practices under which the individual Defendants, and Does 1 – 20, committed the acts or omissions complained of herein, and of which policies, practices, customs, and/or procedures, and/or failure to train, whether promulgated in written form, encouraged, or allowed to persist by Defendant COUNTY condoned, ratified, and ignored without remediation the conduct of the police officer Defendants pursuant to said policies, practices, customs, and procedures, as complained of herein.

51.     As the employer of police officers and their supervisors, COUNTY and/or SHERIFF had primary responsibility for the training, education, and supervision of police officers, and all other SHERIFF personnel, and SHERIFF supervisors. Plaintiff contends that the policies, practices, and procedures of SHERIFF aforesaid and herein, constitute a basis for governmental liability in this case pursuant to the *Monell* theory of Liability. Plaintiff has not and does not plead as a separate "Claim for Relief," The *Monell* liability of the COUNTY, because a "*Monell* claim," is a legal theory of vicarious liability for the action or inaction of another, not a stand-alone "Claim for Relief." However, in the event the Court may desire a separate Claim for Relief for such liability, Plaintiff reserves the right to seek leave to separately set forth a Claim for Relief for *Monell* liability.

52.     Such *Monell* liability also exists based on the fact COUNTY and/or SHERIFF has failed to train at all and/or failed to train employees adequately on state and federal laws, statutes, and/or regulations implicated in the context of a child abuse/neglect

COMPLAINT FOR DAMAGES
SANDOVAL, ET. AL. v. COUNTY OF SAN BERNARDINO, ET. AL.

21

investigation. This failure to train leads to and is the driving force behind the illegal removals of children in the COUNTY, such as occurred in this matter. For these policies, procedures, practices/customs, and inadequate or non-existent training, Plaintiff do hereby seek to hold COUNTY responsible in whole or in part for the conduct of the individual Defendants herein named.

53.    Additionally, COUNTY and/or SHERIFF has developed a long-standing practice of removing children without a warrant in circumstances that do not constitute an imminent risk of serious bodily injury, and/or without reasonable investigation, and/or when the risk of harm to a child is not so imminent as to have insufficient time within which to obtain a warrant, a process presumably involving the consideration of neutral and detached judicial officer.

54.    Defendant DETECTIVE VANAYES QUEZADA ("QUEZADA"), was an employee of the COUNTY and/or SHERIFF as a DETECTIVE at the time of the events and circumstances complained of herein. Plaintiff is informed and believes that QUEZADA was in the Specialized Investigations Division for the Crime Against Children (CAC), had the following identifying serial number G3235 and was a resident of COUNTY.

55.    Defendant DETECTIVE J. BURKHART ("BURKHART"), was an employee of the COUNTY and/or SHERIFF as a DETECTIVE at the time of the events and circumstances complained of herein. Plaintiff is informed and believes that QUEZADA

COMPLAINT FOR DAMAGES
SANDOVAL, ET. AL. v. COUNTY OF SAN BERNARDINO, ET. AL.

22

was in the Specialized Investigations Division for the Crime Against Children (CAC),

had the following identifying serial number A8313 and was a resident of COUNTY.

56.     Defendant DETECTIVE RACHEL YOUNG ("YOUNG"), was an employee of the COUNTY and/or SHERIFF as a DETECTIVE at the time of the events and circumstances complained of herein. Plaintiff is informed and believes that QUEZADA was in the Specialized Investigations Division for the Crime Against Children (CAC), was a resident of COUNTY.

57.     Defendant DETECTIVE MANDONADO ("MALDONADO"), was an employee of the COUNTY and/or SHERIFF as a DETECTIVE at the time of the events and circumstances complained of herein. Plaintiff is informed and believes that QUEZADA was in the Specialized Investigations Division for the Crime Against Children (CAC), was a resident of COUNTY.

58.     Plaintiffs are informed and believe and, on such basis, allege that each of the above-named parties were and are the agent, employee, principal, employer and/or co-conspirator of each of the remaining defendants and/or vice versa. In addition, Plaintiffs are informed and believe and, on such basis, allege that the defendants named hereinabove, and each of them, are responsible in some manner for the occurrences herein alleged, and that each of the above-named defendants conspired with, and/or aided and/or abetted and/or jointly collaborated with each of the remaining defendants and identified persons in committing the acts herein alleged.

COMPLAINT FOR DAMAGES
SANDOVAL, ET. AL. v. COUNTY OF SAN BERNARDINO, ET. AL.

23

59.     Plaintiffs are informed and believe, and thereon alleges, that the individually named Defendant officers were decision makers in the making and/or implementation of COUNTY policy regarding the removal and continued detention of A.A., E.C., and A.C., During an investigation into allegations of child abuse generally, and in the case involving NICK, CLAUDIA, A.A., E.C. and A.C., specifically, and the de facto decision makers on the decision to remove children such as A.A., E.C. and A.C., from their parents.

60.     Plaintiff is informed and believes and, based upon such information and belief, allege that at all times herein mentioned, QUEZADA, BURKHART, YOUNG and MALDONADO and Does 1- 20, were each the agent of each other, and/or employees of their codefendant COUNTY and/or SHERIFF, and each of Defendants were acting within the scope, purpose, and authority of their employer, COUNTY and/or SHERIFF, and with the knowledge, permission and consent of said co-defendants, and each of them, and/or within the scope and purpose of a conspiracy to violate Plaintiff's rights.

61.     Plaintiffs are informed and believe and, on such basis, allege that each of the above-named defendants and settling co-conspirators were acting under color of law in committing the acts herein alleged, and that in doing the things herein alleged defendants, and each of them, were acting within the course and scope of their duties as employees or agents of each other.

62.     Defendants LOMA LINDA UNIVERSITY CHILDREN HOSPITAL (LLUCH), LOMA LINDA UNIVERSITY MEDICAL CENTER (LLUMC), LOMA LINDA

COMPLAINT FOR DAMAGES
SANDOVAL, ET. AL. v. COUNTY OF SAN BERNARDINO, ET. AL.

24

UNIVERSITY HEALTH CARE (LLUHC), LOMA LINDA UNIVERSITY (LLU) (hereinafter "LLUH") are persons within the meaning of 42 U.S.C. § 1983 and are subject to *Monell* liability. When working in joint collaboration to curtail the rights of parents in Plaintiffs' circumstances, the *Monell* defendants - and each of them, had a duty to Plaintiffs at all times, to establish, implement and follow policies, procedures, customs and/or practices (hereinafter "policy" or "policies") which confirm and provide the protections guaranteed Plaintiffs under the United States Constitution, including those under the Fourteenth Amendments, to include without limitation, the protection of the right to familial relations; the right to privacy; the right not to be defamed or stigmatized; and the right to procedural due process. Said defendant also has a duty to use reasonable care to select, assign, supervise, train, control, and review the activities of all their agents, officers, employees and those acting under them, including defendants AZIZ, JACOBSON, KHAN, GRANT, and WU, so as to protect Plaintiffs' constitutional rights in order to avoid causing the injuries and damages herein alleged. Based on the duties charged to *Monell* Defendants, including the nature of their work relating to juvenile dependency proceedings, *Monell* Defendants knew or should have known of the obvious need to establish customs, policies, and practices as would be required to protect the aforementioned civil rights of parents and their children.

63.     In collaborating with the COUNTY to improperly curtail Plaintiffs' constitutional rights, the *Monell* Defendants, and each of them, established and/or followed policies, procedures, customs, and/or practices which policies, procedures, customs, practices

and/or usages were the moving force behind the violations of Plaintiffs' constitutional rights, including those arising under the Fourteenth Amendment of the United States Constitution as follows:

a.      The policy and/or practice of jointly collaborating with state child welfare services agencies in detaining and/or removing children from their family and homes without exigent circumstances (imminent danger of serious bodily injury), court order and/or consent as part of their greater efforts to collaborate with government child welfare agencies in fabricating evidence to support the government's unlawful detention of children from their parents;

b.      the policy and/or practice of falsely accusing parents of suffering from substance abuse or mental illness as a basis for removing children from their parents' care as part of their greater efforts to collaborate with government child welfare agencies in fabricating evidence to support the government's unlawful detention of children from their parents;

c.      the policy and/or practice of fabricating evidence against a parent in order to support a knowingly false referral for child abuse;

d.      the policy and/or practice of withholding exculpatory evidence from investigators of child abuse as part of their greater efforts to collaborate with government child welfare agencies in fabricating evidence to support the government's unlawful detention of children from their parents;

e.      the policy and/or practice of accusing parents of child abuse in order to intimidate parents to providing "consent" to perform medical procedures, investigative procedures,

or other invasive and unnecessary examinations of a child, prior to reporting any instance of child abuse to child welfare service agencies;

f.      the policy and/or practice of knowingly assisting in the wrongful removal or detention of children, and continuing to detain them for an unreasonable period after any alleged basis for detention is negated;

g.      by acting with deliberate indifference in implementing policy of inadequate training and/or supervision, and/or by failing to train and/or supervise its officers, agents, employees and state actors, in providing the constitutional protections guaranteed to individuals, including those under the Fourteenth Amendment, when performing actions related to child abuse and dependency type proceedings;(This list is not exhaustive due to the pending nature of discovery and the privileged and protected records of investigative and juvenile dependency type proceedings. Plaintiff may seek leave to amend this pleading as more information becomes available.)

64.     Plaintiff is informed and believes and on such basis alleges that all of the foregoing customs, polices, practices, and usages of the private corporation *Monell* Defendants were promulgated in order to increase revenues for the particular hospital Defendants in that each child that is brought within their respective grasp and processed, in search of a diagnosis of child abuse (on information and belief) generates a government funded revenue stream which brings a massive inflow of revenue to the private hospitals which are willing to collaborate with government social services agencies to wrongfully remove children from their homes. Hence, it benefits the hospital

COMPLAINT FOR DAMAGES
SANDOVAL, ET. AL. v. COUNTY OF SAN BERNARDINO, ET. AL.

27

defendants to voluntary collaborate with the government to generate false evidence to support over-reaching claims of child abuse when none in fact exists.

65.   Plaintiffs are informed and believe and on such basis allege that each of the above named parties were and are the agent, employee, principal, employer and/or co-conspirator of each of the remaining defendants and/or vice versa. In addition, Plaintiffs are informed and believe and on such basis allege that the defendants named hereinabove, and each of them, are responsible in some manner for the occurrences herein alleged, and that each of the above named defendants conspired with, and/or aided and/or abetted and/or jointly collaborated with each of the remaining defendants and identified persons in committing the acts herein alleged.

66.   The *Monell* hospital Defendants breached their respective duties and obligations to Plaintiffs by, but not limited to, failing to establish, implement and follow the correct and proper Constitutional policies, procedures, customs, and practices; by failing to properly select, supervise, train, control, and review its agents and employees as to their compliance with Constitutional safeguards; and by deliberately permitting Defendants AZIZ, JACOBSON, KHAN, GRANT, and WU and DOES 1 through 20, inclusive, to engage in the unlawful and unconstitutional conduct as alleged herein with at total indifference to the rights of affected parents, including Plaintiffs herein.

67.   *Monell* hospital Defendants, and each of them, knew, or should have known, that by breaching the above-mentioned duties and obligations that it was reasonably foreseeable that its agency policies, practices, customs, and usages would, and did, cause

COMPLAINT FOR DAMAGES
SANDOVAL, ET. AL. v. COUNTY OF SAN BERNARDINO, ET. AL.

28

Plaintiffs to be injured and damaged by *Monell* Defendants' wrongful policies, or deliberate lack thereof or deliberate indifference to the need for such policies and/or training, and other acts as alleged herein, and that such breaches occurred in contravention of public policy and their legal duties and obligations to Plaintiffs; and that such policies were the moving force behind the violation of Plaintiffs' constitutional rights as alleged herein above.

68.     These actions, and/or inactions, of *Monell* hospital defendants are the moving force behind, and direct and proximate cause of Plaintiffs' injuries, as alleged herein; and as a result, Plaintiffs have sustained general and special damages, to an extent and in an amount to be proven at trial. In addition, Plaintiffs have incurred, and will continue to incur, attorneys fees, costs and expenses, including those authorized by 42 U.S.C. § 1988, to an extent and in an amount subject to proof at trial.

69.     Plaintiffs are informed and believe and on such basis allege that each of the above named defendants and settling co-conspirators were acting under color of law in committing the acts herein alleged, and that in doing the things herein alleged defendants, and each of them, were acting within the course and scope of their duties as employees or agents of each other.

70.     Plaintiffs are ignorant of the true names and identities of those Defendants sued fictitiously herein as Does 1-20, inclusive.

71.     Plaintiffs are informed and believe that the individual Defendants named herein, including the Does Defendants participated in some manner in the events set forth in this

COMPLAINT FOR DAMAGES
SANDOVAL, ET. AL. v. COUNTY OF SAN BERNARDINO, ET. AL.

29

Complaint, or failed to participate in some manner, which acts or failures to act were in some manner a proximate cause of the injuries complained of by Plaintiffs herein, and for which, whether by conspiracy to violate the Plaintiffs' rights, agreement, inadequate supervision, inadequate training, consent, ratification, or active participation, such Doe Defendants are responsible and/or liable for the Plaintiffs' injuries and damages.

72.     Defendants DOES 1-20 are identified and sued herein by such fictitious names, their true names and capacities being unknown to Plaintiffs. When ascertained, Plaintiffs will amend this Complaint by inserting their true names and capacities. Plaintiffs are informed and believe and thereon allege that each of the fictitiously named Defendants are responsible in some manner for the occurrences herein alleged, and those Defendants proximately caused, are responsible for and/or legally liable for Plaintiffs' damages as herein alleged. Each reference in this complaint to "Defendant," "Defendants," or a specifically named Defendant refers to and includes all Defendants sued under fictitious names. On information and belief, Plaintiffs make all allegations contained in this Complaint against all Defendants, including DOES 1-20. At all times mentioned herein, DOES 1-20 were acting under color of law and within the course and scope of their respective duties as CFS agents and/or employees.

73.     Hereinafter, when referred to collectively, the Defendants in paragraphs 16 through 27, inclusive, may occasionally be referred to as Social Worker Defendants.

74.     Whenever this Complaint makes reference to any act of Defendants, such allegations shall be deemed to mean all named Defendants and DOES 1-20, or their

COMPLAINT FOR DAMAGES
SANDOVAL, ET. AL. v. COUNTY OF SAN BERNARDINO, ET. AL.

30

officers, agents, managers, representatives, employees, heirs, assignees, customers, tenants, who did or authorized such acts while actively engaged in the operation, managenment, direction or control of the affairs of Defendants (or any of them) and while acting within the course and scope of their duties, except as specifically alleged to the contrary.

75.    At all times herein mentioned and with respect to the specific matters alleged in this Complaint, Plaintiffs are informed and believe that each Defendant (including DOES 1-20), was a parent, subsidiary, affiliate, alter ego, partner, agent, franchisee, licensee, employee, employer, controlling franchiser, controlling licensor, principal, and/or joint venturer of each of the remaining Defendants, and was at all times acting within the course and scope of such agency, service, employment, control and/or joint venture, and each Defendant has ratified, approved, conspired in, profited from and/or authorized the acts of each of the remaining Defendants and/or failed to prevent such acts when having the power and/or duty to do so, with full knowledge of said acts.

## COMMON ALLEGATIONS

76.    At all relevant times, NICK, CLAUDIA and their four children, A.A. (5 yrs. Old at time of removal), E.C. (1 yrs. old at time of removal), A.C. (21 day old at time of removal) and E.D.C. (9 days old at time of removal) constituted a family unit, entitled to Constitutional protections arising under the First, Fourth, and Fourteenth Amendments. This includes, but is not limited to, the right to live together free of unwarranted governmental interference, the right to familial privacy, right to be free from government

deception in the presentation of evidence to the courts, and the right of parents to reasonably direct the upbringing, care, and control of their children without unwarranted governmental interference. These rights also included medical care and the making of important medical decisions for their children.

77.     In addition, NICK, CLAUDIA, and all their children enjoyed a separate and distinct right to live together without undue governmental interference.

78.     Nick and Claudia, like almost every parent, noticed something was not right with their newborn and they did what most average parents would do, they took their daughter to the doctor thinking they would get the help their daughter needed in order to address her condition.  However, they were unaware of the close-net, enmeshed relationship CFS and LLUCH have when it comes to "investigating" child abuse. Although CFS is charged with investigating suspected abuse and neglect of minors CFS is still mandated to obtain medical consultations to supplement its work. Lying in wait are specialized physicians and whole hospital teams that cooperate extensively CFS and law enforcement, as a matter of practice.  The pediatric child abuse and trauma team at LLUCH is the investigatory apparatus that exists to provide the county with the proof it desires, and finding that the injuries are a result of abuse is clearly the easiest and expedient result regardless of  the evidence that these children are clearly suffering from some sort of metabolic and/or congenital disorder that is very likely to be rare and thus takes significant more time and testing to find out.

COMPLAINT FOR DAMAGES
SANDOVAL, ET. AL. v. COUNTY OF SAN BERNARDINO, ET. AL.

32

79.    AZIZ , and other named hospital defendants, and named CFS social workers worked hand in hand together to find that the injuries were as a result of abuse at the hands of one or more of the child's parents. Essentially it is a ready-made litigation team that works hand in hand with CFS to provide the records needed to substantiate their preconceived conclusion of abuse. The CFS reports are created with an agenda as opposed to providing all possible explanations, as objective investigative work requires, and is necessary to get to the truth.  Some diagnoses are, by virtue of their very existence, treated as prima facia proof of abuse and neglect.  However, "Child abuse experts" or in this case, a first year pediatrician, 2 months into her 3-year training program lack the requisite training to accurately diagnose specific injuries and whether they are as a result of physical abuse.  For example, AZIZ undeniably stated that the minors have multiple rib fractures.  However, the pediatric orthopedic surgeon, Dr Grogan, reviewed the minors' entire medical records and all the bone scans and MRI imaging and unequivocally found that there were NO rib fractures at all.

OCTOBRE 15 2021 TOOK CHILDREN TO LLUCH, ED

80.    A.C. is admitted to LLUCH after visit to the pediatrician, Dr. Barber, on October 14, 2021. He referred A.C. to a larger, more comprehensive medical facility because he knew that he did not have the means or knowledge to adequately diagnose her medical issues.  After a full physical of A.C, he found no signs of physical damage. He also found A.C. to be within the normal limits for her age and without any apparent health problems, other than the small spot (broken capillary) in

COMPLAINT FOR DAMAGES
SANDOVAL, ET. AL. v. COUNTY OF SAN BERNARDINO, ET. AL.

33

her eye. Dr. BARBER stated that babies can rupture the capillaries in their eyes involuntarily and/or when they cough or cry, which he stated was nothing urgent. Dr. BARBER then stated that they should get further work-up at the hospital because they have more facilities, but that it was not urgent and that they could take her after Nick finished work (as they only had one working car between the two of them). Despite this fact, HART alleged that," the mother Claudia Sandoval", and "the father, Nick Castaneda,… have a history of failing to ensure to provide necessary medical treatment for the child, A.C… the child was hospitalized as a result of being non-compliant with medically advised treatment..." This is false. CLAUDIA and NICK took their daughter the following day as they asked Dr Barber if it was ok to wait a day as Nick was at work and they only had one car between them.

81.    HART, in the petition, stated that A.C. has a "subdural hematoma on both the left and right side of the head, microhemorrhages to the child's brain and subcongunctival hemorrhages to the left eye" however on 10/16/2021 A.C.'s Brain MRI without contrast shows "small" subdural hematomas underlying the right parietal displaced skull fracture and along the left temporal and occipital lobes. "Trace" hemorrhage along the posterior falx and left tentorium. "Small focus" of extra-axial hemorrhage at the right frontal vertex. Suggestion of "tiny bifrontal microhemorrhages." A.C. was born with an accessory occipital suture that was confirmed to not be a skull fracture, however, "small and tiny hematomas" were present along the occipital suture as well, A.C.'s laboratory

COMPLAINT FOR DAMAGES
SANDOVAL, ET. AL. v. COUNTY OF SAN BERNARDINO, ET. AL.

34

test show that A.C. has a Platelet Level of 662 bil/L (normal: 130-460 bil/L) and a

Hemoglobin Level of 9.5 g/dL (normal: 10-18 g/dL).

82.     On 2/16/2022 A.C. is admitted to MemorialCare Long Beach in critical condition

A.C. started vomiting blood (Hematemesis) and spiked a fever, Lab tests reveal elevated

platelets and abnormal blood counts (the same flags from LLUCH) An procedure was

done to stop the bleeding that was coming through the fundus without specific lesions

(spontaneous bleed), A.C. goes into respiratory failure and has to be intubated and have a

NG tube installed, A.C. tests positive for multiple viruses and was septic, Further testing

was done confirming that A.C. does have two very serious and life threatening bleeding

disorders, A.C. amazingly recovers and the doctors recommend that A.C. be seen by a

geneticist ASAP in Consideration of A.C.'s bone abnormalities, bleeding disorders and

immune system issues (indicative of a bone marrow issue)

83.     On 10/12/2022 Dr. AZIZ testifies under oath that Athena had normocytic anemia

due to the "amount of bleeding" caused by the injuries. One read previously that the

Pediatric Radiologist identified the blood seen was "trace," "tiny" and "small" bleeds.

Athena did not have active bleeding when she was admitted. The transcript is from the

10/12/2022 dependency hearing in which Dr. AZIZ is being cross examination by County

Counsel Hanna Tavill.


84.     HART, in the petition, stated that A.C. had a "corner fracture to the femur",

however the medical records clearly states that "Irregularity of the right distal metaphysis

is likely a normal variant distal tibia spur." The original irregularity seen on imaging was identified multiple times as a perichondral spur which can occur from Ehlers-Danlos disease (in which the mother has tested positive for on her genetic testing), infantile rickets due to Vitamin D deficiency (A.C.is Vitamin D deficient), or a sign of congenital bone dysplasia (in which both A.C. and E.C.'s genetic panel revealed the same mutation that causes bone dysplasia). Permultiple imaging studies, the conclusion was that no actual trauma based fractures or injuries were identified on A.C.'s lower extremities.

85.     HART, in the petition, stated that A.C. has a "corner fracture to the knee" however the medical records clearly state that 10/26/2021. A.C. had x-rays done on her lower extremities and the pediatric radiologist now state "that there are no healing fractures seen and there isn't a fracture of the left knee".  On 11/29/2021- A.C. had a repeat x-rays of her lower extremities and the pediatric radiologist again states that "No fracture identified. Similar subtle cortical irregularity involving the distal tibia medially, supporting perichondral spur."

86.     On 12/1/2021- Pediatric Radiologist Dr. WU has a phone call with Dr. AZIZ at 9:24 am to tell her that the right proximal tibia imaging showed "No fracture is identified. Similar subtle cortical irregularity involving the distal tibia medically, supporting perichondral spur" and that x-rays of A.C.'s knees showed "No fracture or osseous abnormality is identified." At 10:11am, Dr. WU puts in an addendum as prompted by his discussion with Dr. AZIZ in which Dr. WU's imaging impression changed to

COMPLAINT FOR DAMAGES
SANDOVAL, ET. AL. v. COUNTY OF SAN BERNARDINO, ET. AL.

36

"...suggestion of increased cortical thickness involving the medial proximal tibial metaphysis, likely reflecting healed metaphyseal fracture" and "No fracture is identified. Essentially healed distal femoral fracture." Dr. AZIZ is a student and does not specialize in pediatric radiology by her own admission under oath. It is completely unethical to change imaging impressions to fit a narrative. It should be noted that Dr. AZIZ did have Dr. Wu make another addendum besides the one above regarding another lower limb imaging report from A.C.'s medical record so that it once again to reflected a "healed fracture" over the original findings of a normal variant/congenital abnormality. Addendums put in by Dr. Wu after being prompted by Dr. AZIZ even though she self-reports that she does not have any specialized pediatric radiology training,

87.    10/12/2022- Dr. AZIZ testifies under oath that A.C. had THREE leg fractures that could only be caused by extreme physical abuse by County Counsel Hanna Tavill, under cross examination.

88.    On Jurisdiction/Disposition report dated 11/10/2021, OWNBEY, asked the mother about rib fractures as HART LISTED rib in several of the allegations in the petition. As a dependency investigator she is required to carefully review all the records, statement by collaterals, interview all pertinent individuals, specially the treating physicians, among other basic requirements.  either OWNBEY flat out lie or she should have know or she wrote the report qith reckless disregard for the truth as she fail to meet the basic

COMPLAINT FOR DAMAGES
SANDOVAL, ET. AL. v. COUNTY OF SAN BERNARDINO, ET. AL.

37

investigator and fail to meet the basic requirement of the dependency investigator

89.     OWNBEY re stated on the first addendum to Jurisdiction/Disposition report that A.C. had a "cortical irregularities involving the left distal tibia metaphysis, the right proximal tibial metaphysis and the right distal femoral metaphysis, however the medical record before Dr. WU discuss it with Dr. AZIZ showing "No fracture is identified. Similar subtle cortical irregularity involving the distal tibia medically, supporting perichondrial spur" and that x-rays of A.C.'s knees showed "No fracture or osseous abnormality is identified."

90.     OWNBEY, in the first Addendum to Jurisdiction/Disposition report stated that A.C. has a "multiple areas of subpleural thickening and cortical irregularity along the posterior medial aspects of bilateral ribs; (right 4th, 5th, 6th, 7th, 8th, ribs and left $3th$, 4th, 5th, 6th, 7th, 8th,  and 9th ribs.) however in the medical records clearly say on11/09/2021- A.C. has an XR Bone Survey that shows "No acute or healing rib fractures detected"

91.     On10/12/2022 Dr. AZIZ testifies under oath that A.C. did not have rib fractures and that the 10/18/2021 imaging showed small abnormalities that are normal variants. Dr. AZIZ did not update her forensic report to reflect that no fractures or injuries of the ribs were identified. Dr. AZIZ doubled down in the forensic report and said that A.C.'s hemorrhaging is most likely caused by squeezing forces and/or compression of the rib cage. NAT protocols require a serum amylase and lipase test when abdominal/chest injuries are suspected. Due to the pancreas' location, an injury often causes serum amylase and lipase to increase significantly. A.C.'s blood work revealed that she had lower than normal levels of both amylase and lipase upon admission.

COMPLAINT FOR DAMAGES
SANDOVAL, ET. AL. v. COUNTY OF SAN BERNARDINO, ET. AL.

38

92.     DR. AZIZ, HART, OWBNEY, they maintain that A.C. had a "two parietal fractures on the left and right side of the skull" however A.C has multiple imaging studies done, each initial report will change. One will see data points such as time and dates that are inconsistent and one will see that Pediatric Radiologist Dr. Wu becomes involved again in the reports changing (just like he changed his reports/made addendums for A.C.'s legs and ribs after speaking to Dr.AZIZ).

93.     Although the first imaging studies were done on October 16th, 2021, one will see a note from Dr. Xue in which she called in a critical result after reviewing the images on October 15th, 2021. Also, Dr. Xue electronically signs the results at 3:43 am (page 11), however, the same exact report will reflect that she signed off at 1:06 am further down A.C.'s LLUCH medical record (page 17). Since most of the system auto-populates, especially for date and time fields, this is a worrisome finding when looking at the authenticity of the reports. The report from page 11 of A.C.'s LLUCH medical record. The same report on page 17 except the signed time changes again. The bone scan done on 10/16 won't have results until 10/18. Critical imaging done for a child in the PICU is absolutely emergent, especially for suspected head traumas. The report indicating that it took two days for a result is a strong indication that the results were either amended/tampered with or an unforgivable error occurred in which a newborn with a supposed head trauma sits without treatment in the PICU for 48 hours. Pediatric Radiologist, Dr. Wu waited to read, result and sign both A.C.'s and E.C.'s XR Bone Survey within minutes of each other on 10/18 even though A.C.'s Bone Survey was done

on 10/16 and E.C.'s was done on 10/17. One will see the imaging report results change over time through addendums and from the pediatric radiologist, Dr. Wu, who was previously shown to make addendums to his report but only after speaking with Dr. AZIZ and only after the results did not reflect Dr. AZIZ's narrative. One will see that as of 10/19 it was still many of the PICU specialists understanding that there was only one skull fracture indicated on the right parietal bone.

94.     10/12/2022- Dr. AZIZ testifies under oath that A.C. has a right and left parietal skull fracture believed to be caused by two different impacts both with the force of a severe car accident however in the actual medical records of LLUCH say on physical exam "general: she is sleeping, she is not in acute distress, appearance: she is not toxic/appearance" the kind of force AZIZ described would have not just been fatal but she would have had signs of massive trauma, swelling, bruising and disfigurement to the skull and face, AZIZ would know A.C. was with no symptoms she was referring.

95.     HART spoke with fellow Dr. GRANT who states that "fractures to the child's is "highly suggestive" of abuse. Explained that there has been no history provided by the parents would suggest otherwise and Dr. fellow AZIZ  stated that the parents of A.C. did not disclose a family history of fragile or easily broken bones, bleeding disorders or easy bruising as JACOBSON stated in her pediatric forensic initial consultation note however in the medical report clearly say "given maternal concern of suspected of

COMPLAINT FOR DAMAGES
SANDOVAL, ET. AL. v. COUNTY OF SAN BERNARDINO, ET. AL.

40

genetic/metabolic disorder causing pathological fractures" Dr. AZIZ was well informed by the mother regarding the mother's concern for metabolic bone disease in both A.C. and E.C.

96.     Dr. AZIZ took this case approximately two months into a three year fellowship program for Child Abuse Pediatrics at LLU Although still clearly a student, Dr. AZIZ testified that she is a qualified expert in the field. When asked why Dr. AZIZ consulted with other medical professionals while forming an opinion, Dr. AZIZ would testify that, "Because I have training, residency training, in pediatrics. I do not have specialty training in radiology or neurosurgery or trauma surgery. So I rely on other subspecialties to get insight into their expertise and get details and find their points and clarify before I can give an opinion on injuries and take a look at what could have caused the injuries." (10/12/2022 Hearing Transcript page 21 line 24 as being examined by County Counsel Hanna Tavill) Although Dr. AZIZ testified that A.C.'s bilateral parietal skull fractures are due to two severe impacts that could be from abuse only, her own mentor, teacher and colleague would disagree.

97.     The NAT Workup guidelines are clear that a differential diagnosis should be explored for bleeding disorders and metabolic bone disorders as they can mimic non accidental traumas Per CDEM guidelines, "If there is concern of an underlying disease

COMPLAINT FOR DAMAGES
SANDOVAL, ET. AL. v. COUNTY OF SAN BERNARDINO, ET. AL.

41

state that may be mimicking abusive injuryor contributing to the injury findings, consider work-up for bleeding disorders or bonedisorders. This usually involves consultation by inpatient or subspecialty services. Othertests which may be ordered by inpatient providers include: fibrinogen, von Willebrand factor, platelet aggregation studies, clotting factor assays, hepatic transaminase, amylase, lipase, toxicology screen, urinalysis, renal and electrolyte panel, calcium, alkaline phosphatase, phosphorus, albumin, parathyroid hormone levels.(7)" A.C. almost hits all markers for metabolic bone disease and bleeding disorders  Diagnosed with Von Willebrand and Thrombocytosis in February of 2022, abnormal alkaline phosphatase, phosphate, platelets, Vitamin D, and abnormal Intact PTH response while admitted at LLUCH A.C.'s Amylase and Lipase were lower than normal values, whereas high values are found in trauma to the torso.

98.     E.C.'s tests revealed abnormal calcium and alkaline phosphatase indicating metabolic bone disorder and she would also have a high prothrombin time and high platelet value indicating a bleeding disorder E.C.'s Amylase and Lipase were normal signifying no trauma to the torso Dr. Aziz and Dr. JACOBSON did not check E.C.'s Vitamin D level nor did she reevaluate E.C.'s rib fractures once it was proven that similar findings in Athena turned out to be normal variants and not rib fractures at all.

99.     Based on MONGER'S report dated on 08/04/2022, that ratify by WILLIAMS when he, or his agent, signed each and every report author by MONGER that said "children assessment center (CAC) report which stated the father NICK, hit the minor with his hand and cries a lot" however A.A. clearly states in the interview he did not

COMPLAINT FOR DAMAGES
SANDOVAL, ET. AL. v. COUNTY OF SAN BERNARDINO, ET. AL.

42

witness such lie, as the interviewer DOMINGUEZ state it at the evidentiary interview report dated 11/22/2021,saying, "brief summary, A.A. did not disclose physical abuse nor did he disclose witnessing such abuse"

100.    Two hours of visit were terminate when SIPIN file a report with fabricate statement regarding nude pictures (WHICH he was not) NICK and the CLAUDIA help the kids make a birthday card for NICK. Among other things, that ratify by RIOS when she, or his agent, signed each and every report author by SIPIN.

101.    ROACH fail perform her duties of care to the children when she fail to provide continuing of care, or by the doctors, by not taking the children to the genetic specialist, appointment/referral that were by the children treating physician. that ratify by WILLIAMS when he, or his agent, signed each and every report author by MONGER.

102.    LOPEZ did not investigate any of the allegations and literally copy and incorporating HART fabricate statements. Ratify by DOUNG when he, or his agent, signed each and every report author by LOPEZ.

103.    LEE having the medical records of the children, and not making sure to review the related matters that CLAUDIA and NICK shared with her, and notifying the court and the social workers who were in charge of children, she failed to provide health follow-up/

COMPLAINT FOR DAMAGES
SANDOVAL, ET. AL. v. COUNTY OF SAN BERNARDINO, ET. AL.

43

referral for A.A., A.C., E.C, E.D.C.

104.    NICK, arrested and being the victim of QUEZADA, YOUNG AND SHERIFF who, without evidence of the accusations, separated him from his family, arresting him and sending him to a detention center, however NICK was exonerated from the charges by the prosecutor.

BACKGROUND REGARDING FAMILIAL BONE DISEASE

105.    For practical purposes we begin the narration of the events with the Mexican citizen LINA ORTEGA, who was born in the early years of the last century. LINA was born with a bone disease that did not allow her to develop her height, since she was very small, less than 1.40 meters (4.6 feet). In adulthood, LINA was very fragile in her physical composition, and her spine became deformed until her upper body was facing the ground.

106.    Dr. Aziz wrote a forensic Report for both E.C. and A.C. separately. After Athena's lab work came back abnormal indicating metabolic bone disease, Dr. Aziz went through and created her own reference ranges outside the pediatric norm on her report to make Athena look like she didn't have any of the "metabolic bone disease" or "bleeding disorder" markers. This also includes the false note of "Within Normal Limits for age" to the forensics report regarding Athena's Vitamin D levels. Above 20 ng/mL is the correct

COMPLAINT FOR DAMAGES
SANDOVAL, ET. AL. v. COUNTY OF SAN BERNARDINO, ET. AL.

44

lowest range for a newborn. The LLUCH medical report shows 11 ng/mL as low and the Pediatric Intensive Care Unit (a team of pediatric specialists) started treating A.C. right away with Vitamin D. Vitamin D wouldn't have been prescribed unless it was truly low and could easily be attributed to what caused Athena's fractures. This is a completely unethical adjustment by Dr. Aziz.

107.    This not only shows backtracking due to a lack of a differential diagnosis workup but that Dr. Aziz knew which values would disprove her assessment so she starts to manipulate the report. What's truly disturbing is this starts the pattern of every lab test and bone scan/imaging used to rule out genetic/congenital blood and bone disorders (which are notorious for mimicking child abuse) has had some manipulation or exaggeration through notations by Dr. Aziz to cover her ack of due diligence. In one of the most obvious displays of Dr. Aziz's failure to cover herself, she forgets to change E.C.'s forensic report "normal ranges" to her new tailored normal ranges exclusively used for Athena. Athena's LLU PICU 10/16/2021 Results, Athena's Same LLU PICU 10/16/2021 Results with Dr. Aziz's "Changes" Forensic Report Page 8.

108.    The NAT Workup guidelines are clear that a differential diagnosis should be explored for bleeding disorders and metabolic bone disorders as they can mimic non-accidental traumas

27.    LINA gave birth to a daughter named MARGARITA AYON, also Mexican, who inherited her mother's physical and bone deficiencies. MARGARITA, like LINA, was very small in size, and she was also physically fragile. Her spine also began to deform at

an early age but was not as deformed as her mother, as she was treated by doctors who delayed bone deformations with orthopedic devices, nutritional supplements and medicines.

28.   MARGARITA gave birth to VICTORIA MOLINA, also Mexican, who, like her mother and grandmother, was born and grew up very small. VICTORIA inherited the bone diseases characteristic of her family. VICTORIA broke her bones easily, just from carrying heavy things. Furthermore, she developed ANEMIA throughout her life, permanently. The anemia that VICTORIA develops is caused by blood being created in the bones, and VICTORIA's bones are of poor quality, just like her ancestors.

29.   VICTORIA gave birth to FELIPA who died as a child, for reasons unexplained at the time. She also gave birth to ADAN who also died due to fractures and notable deformations in the skull. VICTORIA also had more children, most of whom have developed pathological fractures in the skull, which are noticeable in the X-ray studies that have been performed. One of these sons of VICTORIA is CESAR SANDOVAL who since childhood developed pathological fractures in the skull, and today (2023) suffers from a bone-degenerative process that began at an early age.

30.   CESAR married his first cousin CLAUDIA MOLINA who was the daughter of PEDRO MOLINA, Brother of VICTORIA MOLINA (That is, the great-grandmother and

grandmother, LINA and MARGARITA are in common, for both CLAUDIA MOLINA and CESAR SANDOVAL).

31.    CESAR SANDOVAL and CLAUDIA MOLINA procreated CLAUDIA SANDOVAL, who also, like her ancestors, was born with bone problems; and she has permanently developed ANEMIA, which, like her family and ancestors, is caused by poor bone quality.

109.    A parade of doctors ,fellow and residents asked the parents questions about what had happened to A.C.. The answers for everyone were the same: "A.C. comes from a family with genetic problems in the bones, her older sister E.C: presented similar symptoms, and the reason for bringing her to the hospital is because a new symptom appeared in the eye". It is very important to note that none of those who treated A.C. at the LLUCH were qualified to provide medical care for an issue as complex as A.C. was facing at that time. Let us remember that in Long Beach a neurosurgeon attended to the case and could not give an accurate diagnosis. How would a group of students/residents and recently graduated general doctors provide correct service in a rare case, with little or no existing literature in the world?

110.    The results of A.C.'s skull imaging studies upon admission revealed that the girl had fractures and deformities just like her older sister E.C. And, given the ignorance of what was happening in the girl's body, the only "reasonable" hypothesis was that "these Latin parents brutally beat the girl and fractured her skull." The hypothesis of brutal

blows prevailed in LLUCH, but how is it possible that a newborn received brutal blows, similar to a crash in a car at 100 miles per hour, and that A.C. was ejected outward, breaking the windshield with the head, and crashing on the pavement with the skull, and that A.C. was still alive? And even more intriguing, how is it possible to have received brutal blows like those they thought without having even a scratch, bump, bruise or abnormality on the scalp? The hypotheses of child abuse and brutal beatings were physically and medically unsustainable and impossible. Common sense vanished in Loma Linda, leaving only a group of racially prejudiced students and doctors who ignored intelligence and based their reasoning on skin color and appearance.

111.   A.C. and her parents were victims of a hospital, surrounded by students and inexperienced doctors who formulated hypotheses of child abuse without having any basis for this. The errors are understandable, a group of inexperienced people attended to the A.C. case, which requires very specialized knowledge, which very few doctors in the world possess. In the face of inexperience and ignorance, bad faith and the formulation of unreal stories appeared: Dr. KOMAL AZIZ, who had barely graduated as a general pediatrician, no more than 15 weeks ago, supervised by Laura Jacobson who also did not have a license or certification to rule child abuse, they ruled child abuse. How is it possible that unlicensed doctors within a huge, multi-million dollar hospital rule on medical matters for which they do not have a license? This is where error and ignorance

COMPLAINT FOR DAMAGES
SANDOVAL, ET. AL. v. COUNTY OF SAN BERNARDINO, ET. AL.

48

end, and evil, hatred and discrimination begin. And, it must be said, the system of fraud and child monetization that exists in San Bernardino County came into play.

32.     The parents were taken to a research center near the hospital for questioning. CLAUDIA and NICK's response to these interrogations was the absolute truth, the same one that many doctors and students had heard: "Nothing illegal or violent has happened with A.C. Her older sister E.C. has similar symptoms." It should be noted that by that time NICK had already gone without proper sleep for more than 3 days. Furthermore, both CLAUDIA and NICK were focused on A.C.'s health status and not on legal matters or police investigations. DETECTIVE QUEZADA took advantage of CLAUDIA and NICK's honesty and made them victims of his ministerial tactics made for criminals, not for people who act in good faith and are accustomed to respecting authority and being transparent.

33.     It is evident that AZIZ,  did not have the experience to treat A.C.'s medical case, because she had no knowledge or licenses in medical genetics, traumatology, rare diseases, nor in child abuse. The hypothesis that AZIZ communicated to QUEZADA about brutal beatings was simply ridiculous. Brutal blows that do not leave any marks on the skin, only on the bones? Faced with this same dilemma was the social worker named SHANNAE HART, ssp. Both police officer QUEZADA and social worker SHANNAE HART did not see physical signs of violence on A.C.'s skin, but they heard AZIZ saying that the minor had received beatings or brutal abuse. AZIZ's diagnosis was not compatible with the reality that was visible to the naked eye. Four inexperienced people

COMPLAINT FOR DAMAGES
SANDOVAL, ET. AL. v. COUNTY OF SAN BERNARDINO, ET. AL.

got together: AZIZ, GRANT, QUEZADA and HART. AZIZ's inexperience was evident in not identifying what was really happening medically with A.C. The inexperience of QUEZADA and Hart was evident when they did not investigate the doctor who spoke of child abuse and brutal mistreatment of a newborn girl when there was no external evidence. If QUEZADA and HART had done what was logical and what the visual evidence clearly showed, they would have investigated AZIZ, and found that AZIZ was not licensed to diagnose child abuse.

34.     The DETECTIVE QUEZADA, YOUNG and social worker HART, believed AZIZ's and GRANT version, who had a doctor's coat, without investigating anything at all about her and him, blaming CLAUDIA and NICK whose version was more attached to the evidence that their eyes saw. These attitudes of AZIZ, GRANT, QUEZADA and Hart, of judging people by their origin and appearance, and not based on evidence, are called racism and discrimination.

35.     Not only does LLU, LLUCH, LLUHC,  put students and inexperienced people to care for children, San Bernardino County also hires and puts in charge of sensitive things inexperienced police officers and social workers who are not capable of objectively analyzing what they observe. Did QUEZADA and Hart know the protocols to determine NAT, when a fracture is the result of blows and when it is caused by biology? How is it possible that public servants who deal with children's cases do not know such basic things

COMPLAINT FOR DAMAGES
SANDOVAL, ET. AL. v. COUNTY OF SAN BERNARDINO, ET. AL.

50

36.     As a result of so much ineptitude, hate and negligence at the LLUCH and in San Bernardino County, CLAUDIA lost custody of her children right there at the hospital, on October 17, 2021. HART arrived at 2:50 am with ssa Christian and deputy Maldonado, hart told CLAUDIA "that they were there to take the kids and that she need to get out of the hospital LLUCH because nick have confess". NICK, that same day he was also arrested and charged with the serious criminal charges that AZIZ diagnosed. That is, NICK did not return to the hospital next to his daughter, and was taken to a detention center accused of brutally beating A.C. and endangering the life of his daughter. Both CLAUDIA and NICK were inhumanly punished by being separated from their children. NICK, arrested and being the victim of a police officer who, without evidence of the accusations, separated him from his family, arresting him and sending him to a detention center. For both of them, this has represented the greatest pain they have experienced in their lives, perpetrated by authorities who are inexperienced and do not have the slightest empathy towards honorable people.

## FIRST CLAIM FOR RELIEF
## JUDICIAL DECEPTION

**(All Plaintiffs Against All Social worker Defendants, and** AZIZ, GRANT, QUEZADA, YOUNG and HART**)**

Count 1: (Fourth and Fourteenth Amendment Violations)

1.     Plaintiffs hereby incorporate by reference all other paragraphs of this Complaint as if set out in full.

2.     At all times relevant herein, there existed a clearly established due process right of

individuals, including Plaintiffs, to not to be subjected to false accusations by government officials, including the deliberate presentation of false or perjured evidence, and/or by the suppression of exculpatory information in court proceedings or in documents submitted with recommendations or requests made to the court. Any reasonable social services agent and/or government agent in **ALL SOCIAL WORKER DEFENDANTS, and** AZIZ, GRANT, QUEZADA, YOUNG and MALDANADO and DOES 1-20 would know that it is a fundamental due process violation to lie, exaggerate, fabricate evidence, and/or suppress material exculpatory evidence in court reports and other documents filed with the Juvenile Court.

3.      In fact, Social worker Defendants along with AZIZ and QUEZADA and DOES 1 through 20, inclusive and each of them, had the affirmative and self-evident duty and obligation to be truthful, honest, accurate, and complete in petitions, reports, and documents submitted and/or presented to the Juvenile Court which had the power to adjudicate substantial rights, including parental rights. Defendants also had an affirmative obligation and duty to refrain from using improper, unlawful, and deceptive means to obtain judicial order ssustaining and/or adopting social worker recommendations or otherwise seeking to denigrate Plaintiffs' well-established liberty interests in familial integrity and continued familial association.

4.      At all relevant times, Defendants and DOES 1 through 20, and each of them, were acting under color of law, and within the course and scope of their official duties when they drafted, created, approved, and/or filed documents with the juvenile court.

5.      Defendants and DOES 1 through 20, and each of them, either singularly or jointly acted and/or agreed to deliberately and/or recklessly present false statements and information, and/or omitted known exculpatory material

COMPLAINT FOR DAMAGES
SANDOVAL, ET. AL. v. COUNTY OF SAN BERNARDINO, ET. AL.

52

information when creating their various documents for presentation to the Juvenile Court, as alleged herein above. This conduct, i.e., Defendants' knowingly deceptive presentation of "evidence" to the Juvenile Court, caused the children's detention and/or prolonged detention from their parents care, custody, and/or control.

6. Had it not been for Defendants and DOES 1 through 20's reckless and/or deliberate false statements and/or omissions of exculpatory material in the Removal Warrant Application, the Juvenile Court would not have issued a Removal Warrant for the children.

7. Had it not been for Defendants and DOES 1 through 20 reckless and/or deliberate false statements and/or omissions of exculpatory material in the Juvenile Dependency Petitions, Detention Report, Jurisdiction/Disposition Report, and/or other reports filed in the Juvenile Court, the Juvenile Court would not have adopted Defendants' recommended findings, and the children's continued and/or prolonged detention would not have occurred.

8. As a direct and proximate result of these Defendants and DOES 1 through 20's reckless misconduct, the plaintiffs have suffered, and will continue to suffer, general and special damages according to proof at trial, including but not limited to, physical manifestations of emotional distress, and/or mental anxiety and anguish, among other things.

9. Due to the malicious, wrongful, and despicable nature of the Defendants and DOES 1 through 20's misconduct, as herein alleged and described above, Plaintiffs are entitled to recover punitive damages against the individual Defendants, and each of them, in accordance with law and subject to proof at trial.

Count 2: (First Amendment Violations).

37. Plaintiffs realleges, and to the extent applicable, incorporates herein as if

set forth in full, Paragraphs 1 through 147. 144. At all times relevant herein, there existed a clearly established first amendment right protecting cohabiting siblings from unwarranted government interference in their relationship. Any reasonable social services agent and/or government agent in Defendants' situation would know that Plaintiffs enjoy this constitutional right.

38.     At all relevant times, Defendants and/or DOES 1 through 20, and each of them, were acting under color of law, and within the course and scope of their official duties when they drafted, created, approved, and/or filed documents with the juvenile court.

39.     Defendants and/or DOES 1 through 20, and each of them, either singularly or jointly acted and/or agreed to deliberately and/or recklessly present false statements and information, and/or omitted known exculpatory material information when creating their various documents for presentation to the Juvenile Court, as alleged herein above. This conduct, i.e., Defendants' knowingly deceptive presentation of evidence to the juvenile court interfered with and/or severed Plaintiffs right to familial assocoaition.

40.     Had it not been Defendants and does' 1-20 deliberate false statements and/or omissions of exculpatory material in the Juvenile Dependency Petitions, Detention Report, Jurisdiction/Disposition Report, Ex Parte Application, Status Review Report, and/or other reports filed in the Juvenile Court, the Juvenile Court would not have adopted Defendants' recommended findings, and Plaintiffs would not have been deprived of their association and/or relationship with their children.

41.     As a direct and proximate result of these Defendants and DOES 1 through 20's reckless misconduct, the plaintiffs have suffered, and will continue to suffer, general and special damages according to proof at trial, including but not limited

COMPLAINT FOR DAMAGES
SANDOVAL, ET. AL. v. COUNTY OF SAN BERNARDINO, ET. AL.

54

to, physical manifestations of emotional distress, and/or mental anxiety and anguish, among other things.

42.     Due to the malicious, wrongful, and despicable nature of the Defendants and/or DOES 1 through 20's misconduct, as herein alleged and described above, Plaintiffs are entitled to recover punitive damages against the individual Defendants, and each of them, in accordance with law and subject to proof at trial.

**THIRD CLAIM FOR RELIEF *MONELL* RELATED CLAIMS** FOR FAILURE TO PROTECT FROM HARM/STATE CREATED DANGER (By All Plaintiffs against COUNTY)

1. Plaintiffs incorporate paragraphs 1 through 184 as though fully set forth herein, and allege that the policies, customs, and practices, and/or non-existent or inadequate training described herein above in all proceeding paragraphs generally and as having occurred in the juvenile dependency cases cited in said paragraphs, which same policies, customs, and practices, and/or non-existent or inadequate training were a moving force in the violations complained of herein above with regard to these Plaintiffs' constitutional rights.

2. Plaintiffs allege these policies, practices, customs and training related issues make the COUNTY itself liable for the actions of the individually named social worker Defendants, and Plaintiffs seek to hold COUNTY liable thereon by this Complaint under the theory of law set forth in *Monell v. Dept of Social Services*,

COMPLAINT FOR DAMAGES
SANDOVAL, ET. AL. v. COUNTY OF SAN BERNARDINO, ET. AL.

55

436 U.S. 658 (1978) and its progeny.

3.  The polices, practices, customs, and/or the non-existent or inadequate training of COUNTY social workers such as the individually named defendants, were the moving force behind the unlawful removal of children without parental notice, consent, or opportunity to attend medical appointments, assessments or treatments during hosptitalization, and the repeated making of false representations, submission of misrepresentations, and omissions of exculpatory information to the juvenile court during the juvenile dependency proceedings involving the minors.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendants, as to all causes of action, as follows:

1.  Plaintiffs demand a jury trial as to the issues so triable;

2.  General, compensatory and special damages according to proof;

3.  Award Plaintiffs punitive damages against individual Defendants, as allowed by law for their extreme and outrageous conduct in complete disregard for the rights of the Plaintiffs, which punitive damages are not sought by law as against the County;

4.  Award Plaintiffs statutory damages and/or attorney's fees against all Defendants as allowed by 42 U.S.C. §1983 and any provision of state or federal law allowing for awards of damages and/or attorney fees;

COMPLAINT FOR DAMAGES
SANDOVAL, ET. AL. v. COUNTY OF SAN BERNARDINO, ET. AL.

5.      Costs of suit incurred herein; and

6.      Grant Plaintiffs further relief as the Court deems just and

proper.

Dated:      October 17, 2023

_____/s/_____/c/_____
Claudia Sandoval ,Nick Castaneda

COMPLAINT FOR DAMAGES
SANDOVAL, ET. AL. v. COUNTY OF SAN BERNARDINO, ET. AL.